**DICKERSON**

v.

**SOUTHERN BELL TEL. & TEL. CO.**

**No. 14656.**

United States Court of Appeals
Fifth Circuit.

April 22, 1954.

Rehearing Denied July 15, 1954.

J. O. Moss, Lucedale, Miss., Luther Maples, Gulfport, Miss., for appellant.

M. M. Roberts, Hattiesburg, Miss., R. W. Thompson, Jr., Gulfport, Miss., E. W. Smith, John A. Boykin, Jr., Guerry R. Thornton, Atlanta, Ga., Mize, Thompson & Mize, Gulfport, Miss., M. M. Roberts, Hattiesburg, Miss., of counsel, for appellee.

Before BORAH and RUSSELL, Circuit Judges, and DAWKINS, District Judge.

DAWKINS, District Judge.

This case, filed originally in the Circuit Court for George County, Mississippi, was removed to the court below on the ground of diverse citizenship. The complaint, in substance, alleged that the appellant's (plaintiff) country store and residence, situated some ten feet apart, were destroyed by fire originating from a stroke of lightning which hit the service line of defendant leading into the building to the telephone; that the said wire was improperly insulated and installed in the building in an obviously negligent manner, the principal feature

of which was the failure to ground the said wire safely; and that the atmospheric electricity which produced the lightning bolt was built up by the resistance in the ground wire and rod arrangement which prevented the current going into the earth and resulted in fire at the telephone which ignited the building. Both the store and the residence were destroyed and the plaintiff's claim is in the sum of $18,786.00.

Defendant's answer was, in effect, a general denial, coupled with a plea that the complaint stated no grounds on which relief could be granted.

The case was tried to a jury, but at the end of plaintiff's case in chief, the lower court directed a verdict in favor of defendant and the former prosecutes this appeal. The issues are: was there sufficient evidence to go to the jury (1) that the fire was caused by the lightning striking defendant's wire? and (2) to show that the buildings were thereby set afire and burned because of the defective installation of the telephone and grounding of the wires?

The transcript consists of some 300 pages including the testimony of seven witnesses, two of them electrical engineers, or experts, and eleven exhibits, the latter consisting principally of parts of the wire, et cetera, of the defendant's line leading into the building. The fire which originated in the store, because of its close proximity, spread promptly to the frame dwelling.

We are of the view that the motion for judgment or a directed verdict should have been denied. We do not believe that it is necessary to review all of the evidence, but sufficient to point out there was enough to go to the jury on the plaintiff's charge of negligence:

Plaintiff testified that he owned the two buildings and that they were destroyed by fire. The store was 20 by 28 feet, built of concrete blocks with concrete floors and front porch and an aluminum metal roof. In one corner was an enclosure measuring approximately 8 x 12 feet, separated from the rest of the store by wooden partitions which was used as a post office in the little community of Bexley. The residence was a large frame building with some 18 rooms, approximately 50 by 60 feet in dimensions, located ten feet from the store, the tracks of the Gulf, Mobile and Ohio Railroad were some 300 feet north of the building, and the defendant's main telephone line was strung along the south side of the railroad's right-of-way. The telephone wire which served plaintiff's premises as well as others as a party line, was strung to a pole some 75 feet from plaintiff's premises and then into the front end of the store.

The fire occurred on July 10th, the telephone had been installed in the spring of the same year, 1949, and the store building had been constructed about a year before. Prior to that time plaintiff had occupied the large frame building both as a residence and a place of business but, as stated, constructed this new one of concrete blocks for use exclusively as a store and post office. Plaintiff testified that he was present when the defendant's line and telephone were installed. He watched the defendant's employees make connection with the ground to protect the property against fire that might be caused from lightning. It was first attached to the eaves of the store building in the usual manner, extended down to a square metal box, described as a lightning arrestor, under the edge of the roof of the building. The line then went from this metal box through a hole bored in the frame of a window on the front porch, up to the ceiling, where it was attached to and followed a 2 x 4 board the length of the post office compartment and then down the partition wall to the telephone. The telephone consisted of a wooden box with crank for ringing, known as the magneto type.

Plaintiff was asked on direct examination if the wire which went into the building had "any insulation other than the wire insulation at any point on the entry of the building * * *" and replied, "No, just that line coming through

top of the window". "Q. * * * was there any insulation on the wire itself?" "A. No sir." The witness was then presented with what he identified as " * * the ground rod" which he said was installed in March 1949 to serve the new building; that it was driven 34 inches into the ground; and that he knew it was "an old rod" because it had "rust pits all over it". It was in substantially the same condition when presented to him on the witness stand as it was when placed in the ground. After the fire his son had pulled it out of the ground without any trouble. When driven to the depth stated, it protruded 2½ feet above the ground and was bent over by the workman with his foot so as to just about touch the ground. He stated further that the "ground wire" was attached to this rod up to the same "little square metal box on the porch"; the wire was wrapped loosely around this rod "an inch or two in the ground"; it was not "clamped or soldered" and when the rod was driven in the ground there was nothing attaching the wire thereto, but the connection was made afterwards.[1]

On the day of the fire plaintiff had gone into the store about 3:00 P.M. to get a soft drink and at that time there was no fire. He and his wife then drove to visit her mother "about half a mile away", leaving no one in the dwelling which, as stated earlier, was only about ten feet distant from the store. About this time a dark cloud was rising in the southwest, and before reaching the mother-in-law's home, there was a lightning flash and severe crash of thunder which sounded as if it were near by; at about that moment, he passed Andy Byrd on the highway, who was driving in the opposite direction toward plaintiff's place on the same highway; that shortly after reaching the mother-in-law's place, he was informed his property was afire and he returned immediately, finding that the post office partition around the telephone was burning.

Andy Byrd stated he met plaintiff "about two miles from the store" and while there were clouds he "did not pay any attention to thunder".[2]

C. E. Dickerson, a brother of plaintiff, lived about 400 yards from the store

**1.** Appellant testified:

"Q. Mr. Dickerson, you state you saw this ground rod, Exhibit '7', driven into the ground at the time it was driven. What and why, if anything, at the time it was driven was attached anywhere to this rod? A. No, sir.

"Q. There was nothing attached to it when it was driven? A. No, sir." (R. 127.)

"Q. At the time the telephone employees installed the ground rod the ground wire and telephone on your store building what did you say to the telephone company employee with reference to the rod? A. I made the remark that it wasn't in the ground properly as supposed to be.

"Q. You did say that? A. He said it was all right, and he called Central and verified that the phone was working, and left." (R. 87.)

"Q. Mr. Dickerson, you testified that the telephone company employee drove the ground rod to a depth of 34 inches. Now where your store and home is located is the ground or earth permanently moist or damp at that depth of 34 inches? A. No, sir." (R. 90.)

**2.** Andy Byrd testified:

"Q. When you got along in front of Mr. Dickerson's store did you notice anything there in reference to the store? A. I just happened to look over and notice the smoke hole in the store. Some was coming out through the top.

"Q. Where was it coming out? A. Right up in the corner.

"Q. Do you know whether or not there was a ridge roll on top of the roof? A. Yes, sir, there was.

"Q. What kind of a roof was that? A. Aluminum tin.

"Q. Was the smoke coming from where—outside or inside of the building? A. It was coming from the inside of the building through there.

"Q. What color was that smoke as you saw it coming out? A. Black.

"Q. Where was most of it coming out? A. It must have been about eight feet back from the front.

"Q. Out at the top? A. Yes, sir.

"Q. Was any coming out at the gables? A. I didn't notice any there.

"Q. What did you do then, Mr. Byrd? A. I turned around and went back up to

and was the second person to reach the scene. Byrd had driven immediately to his house after discovering smoke coming out of the building and the two went back to the store. This witness identified a number of photographs which he took, including one in which the back end of his brother's store could be seen from the witness's home. At about three o'clock, the day of the fire, he was sitting on his front porch with a number of other persons. He saw plaintiff go by.[3]

Mr. Charlie's and told him, Mr. Charlie Dickerson's.

"Q. Then what did you do? A. We went back down there with him.

"Q. How far does Mr. Charlie Dickerson live from the building? A. I'd say about a quarter.

"Q. About a quarter of a mile, is that right? A. Yes, sir.

"Q. Did you turn around at his place and come immediately back to the store? A. Yes, sir." (R. 131.)

3. C. E. Dickerson testified:

"Q. While you were sitting there and about the time he passed did you notice anything with reference to the weather? A. Yes, sir. A cloud came up—thunder cloud.

"Q. Did you notice any lightning or thunder? A. Yes, sir. Particularly one stroke—just a hard stroke of lightning.

"Q. What time was that stroke with reference to the time that Mr. Albert Dickerson passed your place? A. Just a few minutes after he passed.

"Q. Be a little more specific than just a few minutes. A. Five to ten minutes after he passed." (R. 153.)

"Q. Did a clap of thunder come along about the same time with the flash of lightning? A. Yes, sir.

"Q. Was that stroke loud and sharp as if near, or distant? A. It was right there, it sounded like.

"Q. Did Mr. Andy Byrd pass your home? A. Yes, I'd say approximately five minutes after the lightning flashed.

"Q. And then what happened, Mr. Dickerson? In your own words tell the court. A. In just a minute or so he had come back to my place and told us Albert's place was on fire and there wasn't anybody at home.

"Q. And when he told you that, who then from your place went to Albert's store which was afire? A. Myself, two sons, and son-in-law jumped in his car and in two minutes we were there." (R. 155.)

"Q. When you got to Mr. Albert Dickerson's store where was the fire emanating from that building, if it was? A. Right in the northwest corner of the building where the post office was located. The fire was all right in that portion.

"Q. Was there any hole in the roof at that time? A. Right over head of the door where the entrance—I call it beaver board—that overhead ceiling was on fire and dropping down on the floor in the building. But, the back of the building was clear—no fire. I looked through the door and windows. There was no fire anywhere other than right there at the post office where the partition is.

"Q. Then the fire was—go ahead, excuse me. A. Back 6 or 7 feet inside the building where the partition of the post office was up in that corner." (R. 156.)

"Q. I'll ask though was there any hole in that aluminum roof—outside roof where you arrived? A. After I tried to connect up the water hose, it was too short, I looked for buckets to get water—and I looked and there was a good sized hole right where this partition went up, right in the roof, aluminum roof, and it was just funneling out. I'd say the blaze was some 10 or 12 feet through that hole.

"Q. You know where the telephone was located in that post office? A. It was on that partition in the post office.

"Q. In the building where there were two partition walls—one was the west side post office partition wall and the other one was the south side partition wall. Tell us which one of those partition walls were you talking about? A. The one as you entered into the front of the building to the left—the one west.

"Q. And was that partition wall burning all the way up to the front door when you first got there? A. No, sir, it wasn't up against the wall, it was mostly in that corner, and the other partition and the paper down there, and plenty of smoke in their. Looked in the door—started to look in there and it was too much fire—the overhead ceiling around that partition right at the door, so I went over to the window on right from the post office on the south side of the building and looked through this window, and there was no fire anywhere in the building except there.

"Q. Just at that one point. A. Yes, sir.

"Q. Did you observe when you first arrived anything with reference to any line, electrical line of any kind, attached to the building? A. Yes, sir. The telephone line was down.

The witness stated he was familiar with the location of the ground wire of the telephone, and that the wall of concrete blocks remained standing after the fire. "The ground wire was burned all the way to the ground, the blocks were scorched down the side of the building." In response to further questioning he saw no concrete blocks or other parts of the building knocked off (purpose being to establish that the fire had broken out on the inside). He looked through the window and there was no signs of damage to the outside and the fire was burning in the vicinity of the telephone on the post office compartment wall. He also identified the grounding rod as being in the same condition as when he saw it before and after the fire.

Much of this testimony was corroborated by the witness Whitfield, a contractor who had constructed the store building in question. He, the plaintiff and others, testified that the telephone wire leading from the railroad right-of-way was burned loose and lying on the ground. This same condition existed according to other witnesses who first arrived at the scene of the fire.

There were two electrical engineers called on behalf of plaintiff who were propounded hypothetical questions involving the above described conditions, who gave it as their opinions that the fire was caused by lightning striking this wire and not being able to flow freely into the ground; because of the defective grounding, it built up and ignited the wall around the telephone. Other witnesses testified that the line of the Rural Electrification Agency, which supplied electricity for the building and the residence, was grounded some twelve feet to permanently moist strata and that it was fully intact when the witnesses reached the scene after the fire had started. Although there had been considerable rain it was the opinion of these experts that the resistance to the current going into the ground was due both to the faulty connection with the ground rod, and the fact that it was driven less than three feet into the earth while that of the Rural Electrification Agency had penetrated some twelve feet to permanent moisture.

If the jury believed this evidence offered by the plaintiff they might have concluded, justifiably, that plaintiff's loss was due to the negligence of the defendant in not properly grounding its wires when the telephone was installed.

The judgment below is set aside and the cause is remanded for further proceedings not inconsistent with the views herein expressed.

"Q. What do you mean by down? A. It was loose from the building.

"Q. Had become detached from the building? A. That's right.

"Q. Go ahead. What else did you observe about lines? A. The R.E.A. line, they were still attached to the building. They fell across Ire Havard's car which followed me down there about three or four minutes I'd say." (R. 156—158.)